IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------X
:
NEW ENGLAND HEALTHCARE                :        3:08 CV 1863 (JGM)
EMPLOYEES WELFARE FUND, ET AL.        :
:
V.                                    :
:
iCARE MANAGEMENT, LLC, ET AL.         :
:                DATE: OCTOBER 26, 2009
-------------------------------------------------------X

MEMORANDUM OF DECISION

On December 9, 2008, plaintiffs New England Health Care Employees Welfare Fund

["Welfare Fund"], and New England Health Care Employees Pension Fund ["Pension

Fund"][collectively "plaintiff Funds" or "plaintiffs"] commenced this action under Section 515

of the Employee Retirement Income Security Act of 1974 ["ERISA"], 29 U.S.C. § 1145, to

recover delinquent contributions, interest, penalties, and liquidated damages owed to the

plaintiffs, Taft-Hartley ERISA funds, by defendants iCare Management, LLC, Chelsea Place

Care Center, LLC, Trinity Hill Care Center, LLC, Wintonbury Care Center, LLC, Farmington

Care Center, LLC, Meriden Care Center, LLC a/k/a Silver Springs Care Center, Westside Care

Center, LLC, Bidwell Care Center, LLC, and Kettle Brook Care Center, LLC ["defendant

Employers" or "defendants"].   (Dkt. #1).[1]   The plaintiff Funds allege that on or about

November 20, 2008, defendant Employers unilaterally redefined the Collective Bargaining

---

[1]Attached to plaintiff Funds' complaint is an affidavit of Christine Pane, the Executive
Director of the Funds, sworn to December 8, 2008 (Exh. A), with the following subexhibits: copy of
excerpts from the CBA for bargaining unit employees under the Welfare Fund at Chelsea Place,
Trinity Hill and Wintonbury (Exh. 1); copy of excerpts from the CBA for bargaining unit employees
under the Welfare Fund at Farmington, Meriden, Westside and Bidwell (Exh. 2); copy of excerpts
from the Collective Bargaining Agreement ["CBA"] for bargaining unit employees under the Pension
Fund at all of the defendant facilities (Exh. 3); and copies of the Contribution/Collection Policies
and Procedures for the Pension and Welfare Funds (Exh. 4).

Agreement ["CBA"] term "gross payroll" and adopted a new method for calculating monthly contributions that includes in gross payroll only hours that employees actually work, not all wages paid to employees for contract benefits such as paid vacation, holiday and sick leave. (Id. ¶ 8).  Plaintiff Funds allege that this new method  contradicts the plain meaning of the CBA contribution requirements, violates the Funds' contribution policies, and alters defendants' longstanding application of the CBA contribution language.  (Id.).  The next day, plaintiff Funds filed an Application for Prejudgment Remedy, and affidavit in support  (Dkts. ##4-5), which was referred to this Magistrate Judge by Senior United States District Judge Charles S. Haight on December 18, 2008.  (Dkt. #8; see Dkts. ##10, 14).  On September 30, 2009, this Magistrate Judge denied plaintiffs' Application for Prejudgment Remedy without prejudice as moot.  (Dkt. #40).

On February 18, 2009, the parties consented to trial before this Magistrate Judge. (Dkt. #16).  On March 6, 2009, defendants filed their Answer (Dkt. #25), with two counterclaims: (1) a claim for refund of overpayments from April 1, 1999 to November 20, 2008 as a result of a miscalculation of certain contributions made under the Family Medical Leave Act ["FMLA"], and a claim for a refund of overpayments relating to the defendant Employers' contributions based on their new interpretation of the language in the CBA (First Count); and a claim for an injunction against defamation based on a document circulated to the Employers' employees entitled, "COBRA Continuation Coverage Election Notice." (Second Count).

On May 11, 2009, the parties filed their Joint Pretrial Memorandum (Dkt. #23), which includes six Stipulations of Fact ["Stip."].  A bench trial was held before this Magistrate Judge on June 9, 2009, at which the following individuals testified: Christine Pane, the Executive

Director of the plaintiff Funds, Gerard J. Frame, plaintiffs' CPA, and Michael Plausse, the CFO of iCare Management, LLC.[2]   (Dkts. ##25-26).   On August 17, 2009, the parties simultaneously filed their post-trial briefs (Dkts. ##34-35),[3] and September 15, 2009, the parties filed their reply briefs.  (Dkts. ##38-39).

For the reasons set forth below, judgment shall enter in favor of plaintiff Funds on their complaint, shall enter for defendant Employers with respect to their counterclaim for FMLA Overpayments, and shall enter for plaintiffs Funds on the remainder of defendant Employers' counterclaims.

## I. FACTUAL FINDINGS

The following constitutes the Court's findings of fact pursuant to FED. R. CIV. P. 52(a)(1).

### A. THE PARTIES

Plaintiff Funds are Taft-Hartley multi-employer trust funds established pursuant to written Declarations and Agreements of Trust in accordance with Section 302(c)(5) of the Labor Management Relations Act ["LMRA"], 29 U.S.C. § 185(c)(5).  (Stip. ¶ 1; Tr. 25).   The Trust documents are administered by a Board of Trustees that consists of both management and labor employees.  (See Tr. 25, 164).  Plaintiff Pension Fund is an employee pension benefit plan within the meaning of Section 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and plaintiff Welfare Fund is an employee welfare benefit plan within the meaning of Section 3(1)

---

[2]Two volumes of exhibits were entered into evidence: plaintiffs' Exhibits 1-36 and defendants' Exhibits A-X.  (Dkts. ##27-28).

A transcript of the court trial, held June 9, 2009, was filed on July 25, 2009 ["Tr."].  (Dkt. #29).

[3]Attached to plaintiffs' Post-Trial brief are copies of case law.

of ERISA, 29 U.S.C. § 1002(1).  (Stip. ¶¶ 2-3).   The Welfare Fund provides health, disability and other benefits to bargaining unit employees who have CBAs with New England Health Care Employees Union, District 1199 ["District 1199"].  (See Tr. 25-26).   There are  fifty employers that contribute to the Fund, and there are approximately 4,500 eligible employee participants, with another 5,000-6,000 participating dependents.  (See id.).

Similarly, the Pension Fund provides benefits to bargaining unit employees who have CBAs with District 1199.  (Tr. 26; see Exhs. 5-7). The Pension Fund is a defined benefit plan, based on employers' contributions, and like the Welfare Fund, it has a Board of Trustees that is jointly administered by management and labor employees.  (Tr. 26).  There are eighty employers that contribute to the Pension Fund, the Fund has 14,000 active participants, and as of December 2008, there were 2,700 members receiving retirement benefits.  (Tr. 27).

Defendants are "employers" and "parties in interest" as defined in Section 3(5) and (14) of ERISA, 29 U.S.C. § 1002(5)[4] and (14).  (Stip. ¶ 4).[5]   Defendants are required to

---

[4]29 U.S.C. § 1002(5) defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."

[5]A "party in interest" is defined under 29 U.S.C. § 1002(14) as:

> (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
>
> (B) a person providing services to such plan;
>
> (C) an employer any of whose employees are covered by such plan;
>
> (D) an employee organization any of whose members are covered by such plan;
>
> (E) an owner, direct or indirect, of 50 percent or more of –
>
>> (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation.
>> (ii) the capital interest or profits interest of a partnership, or

make monthly contributions to plaintiff Funds under the terms of defendants' CBAs with District 1199.  (Stip. ¶¶ 5-6; Tr. 27-28; Exhs. 5-7).

B. THE CBAs

There are three collective bargaining agreements at issue in this case, all of which were effective from 2005 through March 2009, governing as follows: (1) Chelsea Place, Trinity, and  Wintonbury (see  Exh. 5; Exh. B); (2) Farmington, Meriden, Westside, and Bidwell (see Exh. 6; Exh. G); and (3) Kettle Brook (see Exh. 7; Exh. H).  (Tr. 36; see also Exh. W).  Kettle Brook only contributes to the Pension Fund, while all others contribute to

---

(iii) the beneficial interest of a trust or unincorporated enterprise,

which is an employer or an employee organization described in subparagraph (C) or (D).

(footnote omitted).

Defendants dispute that iCare Management, LLC ["iCare"]is a proper defendant in this case, as iCare is not an "employer." (Stip. ¶ 4 & n.1; Dkt. #20, at 1, ¶ 4; see Dkt. #34, at 21-22). An "employer" is defined by the Agreement and Declaration of Trust of the Pension and Welfare Funds as:

Any individual, firm, association, partnership or corporation whose employees are employed under the terms of and who has entered into, or is otherwise bound by, a [CBA] with said Union which provides for contributing to the Trust Fund herein created and provided for.  Any Employer who contributes to the Trust Fund created hereunder shall, by the act of contributing, become a party to this Agreement whether or not any such contributing Employer has signed this Agreement or a counterpart thereof.

(Exhs. 1-2 at 2, Art. I, § I(a)).

As in Heffernan v. iCare Mgmt., LLC, 356 F. Supp. 2d 141 (D. Conn. 2005), the CBAs in this case do not expressly define the term "employer." 356 F. Supp. 2d at 150.  However, as stated in their Preamble, the party to the CBA for Chelsea Place, Trinity and Wintonbury (Exh. 5, at 2), and to the CBA for Farmington, Meriden, Westside and Bidwell (Exh. 6, at 2), is iCare, on behalf of the individual employers.  As Senior United States District Judge Dominic J. Squatrito concluded in Heffernan, "[t]he Employers' argument [that iCare is not an 'employer' under ERISA,] lacks merit. . . . [E]ach defendant is an employer who is obligated to make contributions to a multiemployer plan, . . . by virtue of its managing agent[, iCare,] signing these agreements 'for' . . . and 'on behalf of' each defendant."  Id.  (citation omitted). Accordingly, the Employers, including iCare, may be held liable under 29 U.S.C. § 1145 and 29 U.S.C. § 1132(g)(2).  See note 28 infra (regarding Heffernan litigation).

both the Welfare and Pension Funds.  (See Exh. 7; Exhs. H, W; Tr. 82-83).   At the trial,

Pane testified that defendant iCare has been a contributing employer with Chelsea, Trinity

and Wintonbury since 1999, with Farmington, Bidwell, Westside and Meriden since 2003, and

most recently, with Kettle Brook since July 2008.  (Tr. 35).  Although the CBAs expired in

March 2009, counsel agreed that the parties are still conducting themselves as if the CBAs

are still in effect.  (Tr. 15-16).

The relevant language of the CBAs governing contributions to the Welfare Fund is as

follows:

>Effective July 1, 2007[,] the employer shall make contributions to the New England Health Care Employees Welfare Fund at the rate of twenty-three percent (23%) of the gross payroll for Employees in the bargaining unit who regularly work an average of twenty (20) or more hours per week and have completed their first ninety (90) days of employment.  Said contributions shall be calculated in accordance with the Fund's contribution policies which are available to all contributing employers.  Such contributions shall be used by the Trustees of the Fund for purpose of providing employees and their beneficiaries with health and other benefits as the Trustees of said Fund may from time to time determine.

(Exh. 5;[6] Exh. B & C;[7] Exh. 6 at 32, § 25.C;  Exh. G at 32, § 25.C).   All three CBAs contain

the following language governing the contributions to the Pension Funds:

>Effective March 16, 2005, the employer shall make contributions to the New England Health Care Employee's Pension Fund at the rate of eight percent (8%) of the gross payroll for Employees in the bargaining unit who regularly work an average of twenty (20) or more hours per week who completed ninety (90) days of employment. Said contributions shall be calculated in accordance with the Fund's contribution policies which are available to all contributing employers.  Such contributions shall be used by the Trustees of the Fund for the purpose of providing employees and their beneficiaries with pension retirement benefits as the Trustees of said Fund

---

[6]In plaintiff's Exh. 5, this provision appears as a Side Letter Agreement, dated July 11, 2005, and is included at the end of this Exhibit (at § 20.C)..

[7]In defendants' exhibits, the underlying CBA is in Exh. B and the Side Letter Agreement is in Exh. C (at § 20.C).

6

may from time to time determine.

(Exh. 5, at 40, § 28.C; Exh. 6, at 33-34, § 26.C; Exh. 7, at 37-38, § 28.B[8]; Exh. B, at 40, § 28.C; Exh. G, at 33-34, § 26.C; Exh. H, at 37, § 28.B[9]).

The Funds collect and account for employers' contributions through the submission of monthly payroll reports that are subject to independent, random audits.  (See  Exhs. 10-23).  The documents governing the collection of employer contributions are the CBAs (Exhs. 5-7; Exhs. B, C, G, H), the Agreements and Declarations of Trust (Exhs. 1-2; Exhs. J-K), and the Contribution/Collection Policies and Procedures. (Exhs. 3-4).

C. THE AGREEMENTS AND DECLARATIONS OF TRUST & THE CONTRIBUTION/COLLECTION POLICIES AND PROCEDURES

The Funds' Contribution/Collection Policies and Procedures provide, by way of the following example, an explanation of the minimum hour requirements articulated in the CBAs:

> If the contract calls for contributions on behalf of all employees in the bargaining unit who regularly work an average of twenty(20) or more hours per week, then in a four (4) week reporting period, all employees that had at least eighty (80) paid hours for that period or twenty (20) or more hours in three (3) of the four (4) weeks must be included for payment.  In a five (5) week reporting period, employees that had at least one hundred (100) paid hours for that period or twenty (20) or more hours in at least three (3) of the five (5) weeks must be included for payment.

(Exh. 3, at 4, § III.C; Exh. 4, at 3, § II.C)(emphasis in original).[10]   Plaintiff Funds' Agreements and Declarations of Trust provide that the "Employers as defined [therein],[11] by

---

[8]For Kettle Brook, the effective date of contributions to the Pension Fund is July 1, 2008 (at 37, Art. 28).

[9]See note 8 supra.

[10]See also Exh. 3, at 3, § III(a)1. (Tr. 49).  This paragraph is addressed in Section II.A. infra.

[11]See note 5 supra.

agreeing to make contributions to the Trust Fund pursuant to a [CBA], [are] conclusively

deemed to have accepted and be bound by [these] Agreement[s] and Declaration[s] of

Trust." (Exh. 1, at 3, Art. I, § I; Exh. 2, at 2, Art. I, § I)(footnote added).    The Declaration

of Trust for the Welfare Fund provides as follows:

> Each Employer shall contribute and pay into the Fund the amount
> specified in accordance with the applicable [CBA] entered into with the Union.
> The Employer contributions constitute an absolute obligation to the Trust
> Fund, and such obligation shall not be subject to setoff or counterclaim which
> an Employer may have for any liability of the Union or of any Employee.  The
> contributions shall be paid to the Trustees or such other depositary as the
> Trustees shall designate only by check, bank draft, money order or other
> negotiable, recognized written method of transmitting money.      The
> contributions shall be submitted together with forms prepared and approved
> by the Trustees and shall be made periodically at times as the Trustees shall
> specify by Rules and Regulations or as may be provided in the applicable
> [CBA].  In no event shall any Employer directly or indirectly receive any
> refund on contributions made by it to the Trust (except in case of a bona fide
> erroneous payment or overpayment of contributions, to the extent permitted
> by law) nor shall an Employer directly or indirectly participate in the
> disposition of the Trust Fund or receive any benefits from the Trust Fund.
> Upon payment of contributions to the Trustees, all responsibilities of the
> Employer for each contribution shall cease, and the Employer shall have no
> responsibilities for the acts of the Trustees, nor shall an Employer be obliged
> to see to the application of any funds or property of the Trust or to see that
> the terms of the Trust have been complied with.

(Exh. J. at 5, Art. II, § 2; Tr. 59-60).   As  Pane testified, the Board of Trustees sets policies

that the Plans must administer (Tr. 64), and it is the Trustees who adopt and change the

Plans, not the individual employers.  (Tr. 70-71; see Tr. 116, 118).[12]

### D. THE CHANGE IN CONTRIBUTION

On November 20, 2008, the Employers distributed a "Notice Regarding Welfare Fund

---

[12]If the Trustees decide that they are going to increase the contribution rate so that the benefit level remains the same, the Trustees make a recommendation and then the Union would negotiate this change to the CBAs with the Employers.  (Tr. 118-20).  Although it is the Trustees and not the individual employers who adopt and change the Plans, the Board of Trustees consists of management, i.e., representatives of the Employers, as well as labor employees.  (See Tr. 25).

Contributions," to their Union employees, informing them the Employers had discovered that instead of basing the monthly contributions to the plaintiff Funds on gross payroll earned by employees who <u>work</u> an average of twenty hours a week, they now were basing the contributions on the number of hours <u>paid</u>.   (Exh. O; Exh. 8; <u>see</u> Tr. 210-11).   The employees were notified that "[a]lthough using paid hours has been the practice of the facilities in the past, it is not consistent with the language of the [CBA].   Accordingly, the Compan[ies] [have] corrected [their] contribution method, effective immediately." (Exh. O; Exh. 8).[13]   In November 2008, defendant Employers submitted their October payroll reports reflecting this change in the employers' contributions.   (Tr.  43-44; <u>see</u> Tr. 52).[14]   In these payroll reports, and all reports submitted thereafter, unlike any of the payroll reports submitted for the years prior,[15] defendants added a column reflecting the "Total Hours Worked." (Tr. 44-46; <u>see</u> Exh. 9).[16]  Defendant Employers' new method of calculating gross

---

[13]Pane, however, testified that "worked" means all paid hours, whether worked or not.  (Tr. 93).

[14]When making the monthly contributions, the employers follow a five-step process: at Step 1, the employers look to the previous month's payroll and identify and exclude the employees who have not completed their first ninety days of employment; then, at Step 2, the employers calculate the total hours "worked," which term is challenged as this step of the analysis is wherein the dispute lies; then, at Step 3, the employers calculate the "average hours" based on the total hours and number of pay periods in that month and then include as gross payroll, the total wages of each employee with a weekly average of twenty or more hours in that month; then, at Step 4, the employer includes as gross payroll, the total wages of each employee with an average of twenty or more hours in that month, and make adjustments to gross payroll for FMLA and Workers' Compensation; and at Step 5, the employers multiply the adjusted gross payroll (what survives the earlier steps)  by the applicable contribution rate, and lastly, for Chelsea Place, Trinity and Wintonbury, which facilities are subject to an annualized cap, the employers calculate and apply the cap.  (Tr. 99-110, 109; Exh. X).

[15]Plausse testified that the overpayments were made since April 1999 for Chelsea Place, Trinity, and  Wintonbury, since December 2003 for Farmington, Meriden, Westside, and Bidwell, and since July 2008 for Kettle Brook.  (Tr. 212).  However, defendants only seek a refund for overpayments from January 1, 2006 forward.  (Tr. 212; Exh. V).

[16]Defendant Employers, through iCare, still contribute based upon the overwhelming majority of paid time off because the 20 hour threshold requires contribution for employees

payroll reduces the contributions to the plaintiff Funds, on average, approximately $30,000.00 a month, and the change affects approximately forty-four percent (44%) of iCare's members who participate in the Funds.  (Tr. 43, 54; see Exh. 24).

Subsequent to the change, plaintiff Funds calculated the contributions that were due based on the 20-hour rule exclusion, and Joanne Brown, an employee of the Funds, e-mailed Deb Cate, the payroll manager at iCare, with the balance due to the Pension and Welfare Funds, in response to which iCare stated it was making payments consistent with the CBAs. (Tr. 51; Exh. 24).[17]  Despite the parties' disagreement over the hours worked versus hours paid analysis, the defendant Employers have continued to make timely monthly contributions, limiting this dispute to approximately 3% of the monthly contributions.  (Tr. 109, 110; Exh. 35).

## II. DISCUSSION

The following constitutes this Court's conclusions of law, pursuant to FED. R. CIV. P. 52(a)(1).

### A. PLAINTIFFS' COMPLAINT

Section 515 of ERISA provides as follows:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of

---

averaging over 20 hours a week over the course of a month.  (Tr. 87-88, 111; Exh. 35). For example, if an employee works a 40 hour week for three weeks and then has one week off, defendant Employers would still contribute because that employee averages 20 hours or more for the month.  (Tr. 89-90; see also Tr. 111).  Conversely, defendant Employers would not contribute in the last month for a full-time employee who works 40  hours a week for eleven months and then goes on vacation for three weeks during the twelfth month.  (Tr. 92; see also Tr. 111, 167-70).

[17]Plaintiffs claims their damages consist of $41,667.00 plus $2,498.00 in interest due to the Pension Fund, $119,305.00 plus $7,179.00 in interest due to the Welfare Fund, plus liquidated damages and attorney fees per the CBAs.  (Tr. 53-55; Exh. 35).  See Section II.C. infra.

such plan or such agreement.

29 U.S.C. § 1145. "The liability created by § 515 may be enforced by the trustees of a plan by bringing an action in federal district court pursuant to § 502." <u>Laborers Health & Welfare Trust Fund For Northern Cal. v. Advanced Lightweight Concrete Co.</u>, 484 U.S. 539, 547 (1988); <u>see</u> 29 U.S.C. § 1132(a)(3).

"Congress enacted [S]ection 515 in order to permit multiemployer plans to rely upon the terms of the collective bargaining agreements and plans as written, thus permitting trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law . . . ." <u>Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio</u>, 133 F.3d 955, 959 (6th Cir. 1998)(internal quotations, alterations & citations omitted); <u>see also NY State Teamsters Conference Pension & Ret. Fund v. UPS, Inc.</u>, 382 F.3d 272, 281 (2d Cir. 2004) ["<u>NY State Teamsters</u>"].[18]   In this case, the relevant language of the CBAs governing contributions to the Welfare Fund requires the Employers to contribute "twenty-three percent (23%) of the gross payroll for Employees in the bargaining unit <u>who regularly work an average of twenty (20) or more hours per week</u> and have completed their first ninety (90) days of employment." (Exh. 5;[19] Exhs. B & C;[20] Exh. 6, at 32, § 25.C;  Exh. G,

---

[18]Section 515, however, serves as a "limitation on the defenses available to an employer when sued by an employee benefit plan," such that there are "only two defenses recognized by the courts: (1) that the pension contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable)." <u>Benson v. Brower's Moving & Storage, Inc.</u>, 907 F.2d 310, 314 (2d Cir.)(citations omitted), <u>cert. denied</u>, 489 U.S. 982 (1990).  However, although the defenses are limited, "the employer may argue that its contributions were in accord with the operative contractual language, and therefore no delinquency existed." <u>Heffernan</u>, 356 F. Supp. 2d at 151(citation omitted).

[19]<u>See</u> note 6 <u>supra</u>.

[20]<u>See</u> note 7 <u>supra</u>.

at 32, § 25.C)(emphasis added).  Similarly, the governing language of the three CBAs relating to the Pension Funds requires the Employers to contribute at a "rate of eight percent (8%) of the gross payroll for Employees in the bargaining unit <u>who regularly work an average of twenty (20) or more hours per week</u> and who have completed ninety (90) days of employment." (Exh. 5, at 40, § 28.C; Exh. 6, at 33-34, § 26.C; Exh. 7, at 37-38, § 28.B; Exh. B, at 40, § 28.C; Exh. G, at 33-34, § 26.C; Exh. H, at 37, § 28.B)(emphasis added).

Conversely, the language of the CBAs Contribution/Collection Policies require:

> Unless the CBA specifically provides otherwise, gross payroll must include <u>all</u> of an employee's paid wages, whether for time worked or not worked, including but not limited to payment for holiday, sick, personal, or vacation time (whether or not taken), regular pay, overtime pay, shift differentials, weekend differentials, bonuses, severance pay, etc.  (i.e.[,] all forms of income included in employees' Medicare wages on Form W-2, exclusive of short-term disability payments).

(Exh. 3, at 3, § III(a)1; Exh. 4, at 2-3, § II(a))(emphasis in original).  Additionally, the Contribution/Collection Policies provide, by way of the following example, an explanation of the minimum hour requirements articulated in the CBAs:

> If the contract calls for contributions on behalf of all employees in the bargaining unit who regularly work an average of twenty(20) or more hours per week, then in a four (4) week reporting period, all employees that had at least eighty (80) paid hours for that period <u>or</u> twenty (20) or more hours in three (3) of the four (4) weeks must be included for payment.  In a five (5) week reporting period, employees that had at least one hundred (100) paid hours for that period <u>or</u> twenty (20) or more hours in at least three (3) of the five (5) weeks must be included for payment.

(Exh. 3, at 4, § III.C; Exh. 4, at 3, § II.C)(emphasis in original).  While Section 515 requires participating employers to make contributions in accordance with the terms under the plan, <u>or</u> the terms of the collective bargaining agreements, the statute does not specify how an inconsistency between those documents would be resolved. That notwithstanding, there is no inherent conflict between the plain text of the CBAs, which reference hours <u>worked</u>,  and

that of the Contribution /Collection Policies, which reference hours <u>paid</u>, in that the language of the CBAs also require that such "contributions shall be calculated in accordance with the Fund's contribution policies . . . ." (Exh. 5, at 40, § 28.C;[21] Exh. 6, at 31-34, §§ 25.C & 26.C; Exh. 7, at 37, § 28.B; Exh. B, at 40, § 28.C & Exh. C;[22] Exh. G, at 32-34, §§ 25.C, 26.C; Exh. H, at 37, § 28.B).   That direction brings the analysis back to the Contribution/Collections Policies' explanation, requiring contributions based on gross payroll, which includes all compensation included on employees' W-2 forms, and which does not differentiate between compensation for hours worked and compensation for paid time off.

Defendants now argue that their change in contribution practices is in accord with the "plain meaning" of the contract language in the CBAs. Plaintiffs, conversely, assert that the longstanding contribution practices have included all compensation.   The fact that the Funds <u>and</u> defendants long have interpreted this language to mean all compensation, rather than just "hours worked," cannot support an argument that defendants' interpretation evidences the "plain meaning" of the contracts.   Rather, the basic fact that there are two reasonable interpretations of the language's "plain meaning" proffered evidences inherent ambiguity in the language.   <u>See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan</u>, 7 F.3d 1091, 1095 (2d Cir. 1993)("Contact language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.")(internal quotations & multiple citations omitted).

As now Senior United States District Judge Dominic J. Squatrito observed in <u>Heffernan</u>

---

[21]<u>See</u> note 6 <u>supra</u>.

[22]<u>See</u> note 7 <u>supra</u>.

v. iCare Mgmt., Inc., 356 F. Supp. 2d 141, 151 (D. Conn. 2005), "[i]n cases where the employer denies liability by claiming that it contributed funds pursuant to the terms of the governing agreement," the Second Circuit directs district courts to "interpret CBAs, [applying] traditional rules of contract interpretation . . . as long as they are consistent with federal labor policies." (citations & internal quotations omitted).  When provisions in the agreement are ambiguous, as in this case, courts may "look to extrinsic factors – such as bargaining history, past practices, and other provisions in the CBA – to interpret the language in question . . . ."  Id. (internal quotations & citation omitted).  Additionally, "as with all contracts," the language of the CBAs should be read so that "no language is rendered superfluous."  Id. (internal quotations & citation omitted).

Defendants concede that up until November 2008, the past practice of all of the involved parties was to interpret  the term in the CBAs, all employees who "regularly work," to include all compensation included in gross payroll.  Furthermore, there is explicit language in the bargained-for CBAs, that the "contributions shall be calculated in accordance with the Fund's contribution policies . . . ." (Exh. 5, at 40, § 28.C;[23] Exh. 6, at 32-34, §§ 25.C & 26.C; Exh. 7, at 37-38, § 28.B; Exh. B;[24] Exh. G, at 32-34, §§ 25.C, 26.C; Exh. H, at 37, § 28.B).  As discussed above, the Contribution/Collection Policies require contributions based on gross payroll, which includes all compensation included on employees' W-2 forms, and which does not differentiate between compensation for hours worked and compensation for paid time off.  Furthermore, these Policies are not unilaterally written by the Funds as the Board of Trustees consist, in part, of management trustees, representing the contributing employers,

---

[23]See note 6 supra.

[24]See note 7 supra.

as well as of union trustees.  (Tr. 25-26, 164).

It is undisputed that the contribution calculations are made based on the previous month's payroll, and that for each employee, the employer must calculate the "average" hours based on total hours and number of pay periods in that month, and then must include as "gross payroll" the total wages of each employee with a weekly average of 20 or more hours in that month.  (Exh. X; Tr. 109-10).  Thus, under this undisputed interpretation of the contribution calculation, gross payroll includes an employee's paid time off hours.  Under defendants' new interpretation, defendants benefit from substantial savings[25] by excluding from the calculation of benefits all monthly wages of employees who drop below the "20 or more hour" threshold when the employees' hours for paid time off, such as vacation, sick, or holiday pay, are excluded from the "20 or more hour" calculation.  (See Tr. 112-14).[26]  In

_____

[25]Six days prior to the change in defendants' contribution, Chris Wright, the President/CEO of iCare, sent a memorandum to all of its employees informing them of "Re-Organization and Preparedness for 'Hard Times' Ahead," in which memorandum, Wright put his employees on notice that iCare must "ensure that [its] current and future limited resources are allocated in the most efficient manner to ensure quality care for our residents while keeping [its] facilities solvent."  (Exh. 36).

[26]In her affidavit, sworn to December 8, 2008, and submitted to this Court with plaintiff Funds' complaint, Pane averred that "[d]efendant employers' new method of calculating monthly contributions includes in gross payroll only hours that employees actually work upon which contributions are based."  (Complaint, Exh. A, ¶ 9).  That, however, is not accurate.  As Pane testified at the trial, defendants' new method of calculating monthly contributions excludes all worked and unworked gross payroll of people who do not meet the 20 hour threshold, which number is much less than excluding all hours for which employees are paid but do not work. (Tr. 114-15).

Additionally, despite the explicit language in the CBAs that the "contributions shall be calculated in accordance with the Fund's contribution policies . . . " (Exh. 5, at § 28.C & see note 6 supra; Exh. 6, at 32-34, §§ 25.C, 26.C; Exh. 7, at 37-38, § 28.B; Exh. B (see note 7 supra); Exh. G, at 32-34, §§ 25.C, 26.C; Exh. H, at 37, § 28.B), Michael Plausse, defendants' Chief Financial Officer, testified that he did not consult the Contribution/Collection Policies prior to changing the contribution.  (Tr. 234).  The Contribution/Collection Policies before the Court are dated the same date that defendants' notice of the change in contribution was distributed to the employees.  (See Exhs. 3, 4, 8; Tr. 142-43).  Although defendants argue that there is no evidence that the relevant provisions of these "self-serving, post-dispute" Contribution/Collection Policies were in effect prior to the commencement of the November 20, 2008 change in contribution (Dkt. #38, at 1-2), the

other words, if an employee works for eleven months and <u>then</u> takes a four week vacation, defendants <u>would not</u> contribute benefits for that last month, because during the month of the four week vacation, the employee falls below the 20 or more hour threshold.  (Tr. 111). Conversely, if the same employee works ten months and then in months eleven and twelve takes two weeks of vacation during both of these months, defendants <u>would</u> contribute because in that second scenario, the employee would still work two weeks in months eleven and twelve, which hours exceed the 20 or more hour threshold.   (<u>See</u> Tr. 111-12). Defendants' new calculation method reveals inconsistent interpretations of the term "work" for the purpose of employer contributions, in that when an employee falls below the 20 hour exclusion, the term "work" only means hours on a job site, while for the purpose of calculating gross payroll, "work" includes all hours paid.   Conversely, the longstanding contribution method of all involved parties, and of all other contributing employers to plaintiff Funds (<u>see</u> Tr. 46), which is to include all of an employee's paid hours, whether for worked hours or paid time off, when applying the "20 hour or more" contribution requirement, represents a reasonable interpretation of the plain language of the contribution policy, and as such, judicial deference to such policy is required by ERISA.[27]  <u>See NY State Teamsters</u>, 382 F.3d at 281-82; <u>see Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 111 (1989)(judicial deference is owed to a fiduciary's reasonable interpretation); <u>Gilbert v. Burlington Indus., Inc.</u>, 765 F.2d 320, 326 (2d Cir. 1985)(Second Circuit concluded that "the

converse is also true; neither party has submitted evidence that these Contribution/Collection Policies differ in any way from those in effect at the time the CBAs became effective.

[27]Contrary to defendants' contention that the Funds' interpretation requires a look-back period to wages or hours completed in prior months (Dkt. #38, at 6-7), defining the term "work" as defendants and plaintiffs had in the past to include hours for which an employee is paid does not require an examination of hours beyond those in that month as full-time employees, <u>i.e.</u>, employees working more than 20 hours a week, pay into their vacation, and paid time off hours by virtue of their status as full-time employees.

U.S. Department of Labor's interpretation that an unfunded severance pay policy is an 'employee welfare benefit plan' under § 1002(1)(B) is a reasonable construction of the statute and entitled to judicial deference."), aff'd mem., 477 U.S. 901 (1986).  Moreover, as the Second Circuit advised in Brown v. Health Care & Ret. Corp. of Am., 25 F.3d 90, 93 (2d Cir. 1994), the "industry's uniform construction of [a clause to the contrary of defendants' construction] is, in the collective bargaining agreement setting, to be given evidentiary significance by the Courts." (citation omitted).  In this case, there are fifty employers that contribute to the Welfare Fund and eighty employers that contribute to the Pension Fund, yet only defendant Employers believe that the "plain language" of the CBAs requires an alternative method of calculating contributions.  (See Tr. 25-27).[28]

### B. DEFENDANTS' COUNTERCLAIMS

#### 1. FIRST COUNT: CLAIM FOR REFUND OF OVERPAYMENTS

Two categories of overpayments are at issue.  The first is defendants' claim for a

---

[28]Defendants further argue that the doctrine of judicial estoppel bars some or all of the Funds' arguments as a matter of law, particularly those relating to interpreting the CBA language in a manner that contradicts the positions taken in Heffernan and Brown. (Dkt. #35, at 15-32; see Exhs. D, L-M).  According to defendants, judicial estoppel precludes the plaintiff Funds from arguing that "work" is an ambiguous term that means something other than actual work, and further precludes the plaintiff Funds from arguing that their eligibility rules for employee benefits are somehow relevant to interpreting the Employers' contribution obligations.  (Dkt. #35, at 31).  Plaintiff Funds assert that defendants' reliance on the plaintiff Funds' previous collection actions exposes defendants' calculated scheme to renege on its contribution obligation. (Dkt. #34, at 17-20).

Although both Brown and Heffernan involved the same parties and/or counsel as in this case, the substantive issues involved differ from the case at hand.  In Brown, the issue addressed was whether an employer had to contribute for employees scheduled to work twenty or more hours a week.  In that case, the Second Circuit held on appeal that the employer had to pay for the hours actually worked, rather than the hours scheduled to work.  (Exh. L).  In Heffernan, at issue, inter alia, was the ambiguity of the phrase "participating bargaining unit member," with almost identical contribution language.  That case did not address work versus paid time off as it relates to the 20-hour threshold, as the 20-hour or more exclusion was added to resolve the dispute in Heffernan.  (Exhs. D-E, M; see also Tr. 121-25, 131-35, 191-93, 205-07, 244-45).  Plausse even conceded that the controversy in this pending litigation had not "been identified as an issue" when he held negotiations leading to the 2006 settlement agreement in Heffernan.  (Tr. 209).

refund for certain FMLA overpayments in 2006 and 2007 ["FMLA Overpayments"],[29] which have been pending and unaddressed by the Funds for more than a year. (Dkt. #20, First Count, ¶ 6). Plaintiff Welfare Fund represented at trial that defendants' two FMLA refund requests have been reviewed by the Fund's auditors and that "the Funds were prepared to recognize those claims," namely all but approximately $6,000, but that pursuant to the Fund policy, the credit cannot be paid until defendants are current with monies due to the Fund. (Tr. 3-8, 147; see Exh. 4, at 8; see also Tr. 188-89).[30] Further, at trial, Pane testified that while one of the refund requests, in the amount of approximately $20,000, was presented to the Welfare Fund more than a year ago, it has not been presented to the Board of Trustees for their approval. (Tr. 147-48). The second request, for $41,115.03, has been addressed and is also ready to be presented to the Board of Trustees. (Tr. 148-50; see Tr. 195). In their Damages Analysis, defendants represent that the total FMLA Overpayments for January 2006 to November 2007 is $67,469.18, of which $22,229.46 was previously itemized for the Welfare Fund in a refund claim submitted on June 17, 2008, and the balance of $45,239.72 was submitted on May 15, 2009. (Exh. V, Tab 2; see also Tr. 220-25). With respect to these FMLA overpayments, the defendant Employers request an immediate setoff in the amount of $60,115.03, in light of the Welfare Fund's admission at trial. (Dkt. #35, at 36).

The case law in the Second Circuit is clear: "[W]hile ERISA does not require a fund to refund overpayments, a fund is permitted to do so in accordance with its own policy."

---

[29]At trial, Plausse testified that these overpayments were the result of contributions made by employers for employees on "self-disability FMLA." (Tr. 222). An employer need not make a contribution on an employee's behalf if an employee is on self-disability FMLA. (Id. See also Exh. 34; Exhs. Q-T).

[30]Documentation substantiating the FMLA Overpayment refund claims was submitted by defendants as recently as May 2009. (See Tr. 188-90, 220).

Brown, 25 F.3d at 93; see Frank L. Ciminelli Const. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund, 976 F.2d 834 (2d Cir. 1992); Dumac Forestry Serv., Inc. v. Int'l Brotherhood of Elec. Workers, 814 F.2d 79 (2d Cir. 1987).[31]   The plaintiffs Funds' "Contribution Refund Policy" is set forth in Section V of the Contribution/Collection Policies and Procedures, including the requirements that the request must be in writing; the request must pertain to contributions made within the past thirty-six months; the employer "must be current in all contributions and other amounts due to the Fund" and must further establish "to the satisfaction of the Trustees, that the contributions were made due to a mistake of fact or law," with necessary documentation; the Fund or participant must not have relied upon these payments to its, her, or his detriment (in which case the request will be denied); the refund must not have "a significant adverse effect on the Fund"; if all the requirements are satisfied, then a refund "shall normally be made, less any reasonable costs incurred by the Fund in investigating the refund request, within two (2) months after the determination by the Trustees that a refund is due";  and the refund is "generally in the form of a credit against, first, any contributions, interest, attorney fees, and collection costs that are due from that employer, and, thereafter, future contributions."  (Exh. 4, at 7-8, § V).

"[A] refund in excess of the fund's refund policy cannot be awarded unless supported by a determination that the refund policy is arbitrary and capricious.  Further, even where the refund policy is arbitrary and capricious, the employer must still establish that the equities favor restitution."  Brown, 25 F.3d at 94 (internal quotations, footnote & citation omitted)(emphasis in original). Thus, defendants are "required to show that the Fund's

---

[31]As the Second Circuit observed, funds' assets are accorded "special status" by ERISA, 29 U.S.C. § 1103(c)(1), which states in relevant part: "Except as provided in [subsection 2], the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose[ ] of providing benefits to participants in the plan . . . ."  Brown, 25 F.3d at 93.

refund policy [is] arbitrary and capricious, that the equities favor[ ] restitution, and what the effect of the setoff [is] upon individual beneficiaries to whom the Fund had incurred and discharged financial responsibilities by reason of the overpayments."  Id.

According to the defendant Employers, they established at trial evidence of their overpayments, and while an Employer who inadvertently overpays into an ERISA fund does not have an automatic right of setoff or refund, a court may order such refund if supported by a determination that the refund policy is arbitrary or capricious, and the employer establishes that equities favor restitution.  (Dkt. #35, at 33-35).  According to the Employers, the Funds do not have any reasonable or consistent policy with respect to refund requests from these particular Employers, which, as this is contrary to the Funds' obligations under the Trust documents and the Settlement Agreement, is per se arbitrary and capricious.  (Id. at 36).   Contrary to these arguments, the Defendant Employers have not established that the refund policy of the plaintiff Funds is "arbitrary and capricious," although it admittedly can be slow and painstaking (see, e.g., Tr. 188-90, 195-96, 229-30).  Moreover, any additional administrative steps are now moot in light of the concessions of plaintiffs' counsel at trial regarding the FMLA Overpayments.  Therefore, the refund with respect to FMLA Overpayments shall be made in accordance with the process set forth in Section V of the Contribution/Collection Policies and Procedures, namely that such refund "shall normally be made, less any reasonable costs incurred by the Fund in investigating the refund request," and the refund is "generally in the form of a credit against, first, any contributions, interest, attorney fees, and collection costs that are due from that employer, and, thereafter, future contributions."  (Exh. 4, at 7-8, § V).   See Section II.A supra, Section II.C. infra.

The second refund claim relates to the overpayments defendants claim were made prior to November 20, 2008, when defendants informed the Funds, the Union, and the Union

employees that an error had been discovered and that it would be corrected in future monthly payments to the Funds; it is for the overpayments made prior to November 20, 2008 for which defendants seek a refund. (Dkt. #20, First Count, ¶¶ 4-5).  According to defendants, the instant court action was initiated by the Funds before defendants had a reasonable opportunity to exhaust their administrative remedies by presenting a claim for a refund to the Funds based on the overpayments made from December 1, 2006 to November 20, 2008.  (Dkt. #20, First Count, ¶¶ 7-8; Tr. 150, 154, 224).  In their Damages Analysis, defendants seek a refund from the Welfare Fund totaling $721,176.00 and from the Pension Fund totaling $220,635.00.  (Exh. V, Tab 1; see also Tr. 213-20).[32]  For the reasons stated in Section II.A. supra, defendants' refund claim for a refund for overpayments from December 2006 to November 2008 is without merit.

### 2. SECOND COUNT: INJUNCTION AGAINST DEFAMATION

In this count, defendant Employers allege that the Funds' false statements that employees' lack of eligibility for benefits is based on the Employers' failure to contribute to the Funds as required by the applicable CBA, have caused the Employers' employees to mistakenly believe that (a) the Employers – not the Funds – control the employees' eligibility and benefits, and (b) the Employers do not contribute to the Funds in accordance with the terms of the CBA, and as a result of the Funds' false statements, the Employers' reputation with their employees has been damaged.  (Dkt. #20, Second Count, ¶¶ 3-5).  According to defendants, an order enjoining the Funds from making further untrue statements is

---

[32]Defendants seek an equitable refund that does not create an undue hardship on the Funds, and for this reason, defendant Employers are requesting a three-year limit on the refund, from 2006 forward, and an order allowing defendant Employers to take the refund over a multi-year period, without interest, in the form of partial set-offs to their monthly contribution.  (Dkt. #35, at 36; see also Tr. 225).

necessary and appropriate to prevent continued harm to the Employers, and the Welfare Funds should be enjoined from checking the box on the COBRA Notice entitled "Employer failed to make required monthly payment to Welfare Fund," in situations in which the Employer has no legal obligation to contribute based on the employee's wages for the month at issue.  (Dkt. #35, at 38-39; see Exh. U; Tr. 225-29).

A COBRA Notice automatically is sent to employees from the Funds if an employee's benefit eligibility status changes.  (Tr. 157-58).  These notices are standard federal government COBRA forms.  (Tr. 230; see Exh. U).  Approximately 300 or 400 of these notices are sent out on a monthly basis (Tr. 159), and as a result of the issuance of notices which indicated that "Your Benefits Coverage will End Due to the Following Event," with a check mark next to "Employer failed to make required monthly payment to Welfare Fund," iCare has had to field complaints from employees, and has had to inform employees that it does not have control over eligibility requirements.  (Tr. 227-28).  Defendants argue that "any statements by the Funds suggesting that the Employers are involved in eligibility determinations or have any obligations that go beyond the contribution formulas are factually and legally untrue," as the Declarations and Agreements of Trust for the Welfare and Pension Funds explicitly specify that "[u]pon payment of contributions to the Trustees, all responsibilities of the Employer for each contribution shall cease . . . ." (Dkt. #35, at 38; see Exh. 2, at 5; Exh. J, at 5).   Defendants do not seek any damages for any alleged defamation, but only injunctive relief.  (Tr. 228-29).

A defamatory statement is a "communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . ." Gambardella v. Apple Health Care, Inc., 86 Conn. App. 842, 848, 863 A.2d 735, 740 (Conn. App. 2005)(internal quotations & citation omitted).  To

establish a prima facie case of defamation, the Employers must demonstrate that: "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."  Id. (internal quotations & citation omitted).

Pane testified that these notices are sent out with this box checked even when an employer is contributing to the Welfare Fund properly, because "many employers, including iCare" do not "give [the Fund] all of the appropriate information, and so the system is going to generate a notice that the employer [did not] pay on this person." (Tr. 158-59).  Pane acknowledged that in some cases, despite the wording of the notice, the employer was not required to make a contribution on behalf of a member, such as when employment is terminated or when there is a reduction in hours.  (Tr. 159).  In such situations, there are corresponding boxes on the COBRA Notice, but rather than checking those off, the system is checking off  "Employer failed to make required monthly payment . . . ." (Tr. 160; Exh. U).

In light of the conclusion reached in Section II.A. supra, defendants cannot establish that  the Welfare Fund has published defamatory statements, as defendants' decision to cease making contributions for certain employees under their new contribution method actually results in a failure of the Employer to make required monthly payments.[33]

---

[33]If in situations where the Employers have no legal obligation to contribute due to a termination of employment or a  reduction in work hours,  the Welfare Fund sends these COBRA Notices to employees reporting that benefits coverage will end because the Employers failed to make required monthly payments, then such notices would constitute a defamatory statement. However, in this case, the notices are sent because, in fact, the Employer made the unilateral decision not to make contributions based on the Employers' calculation of the total number of hours an employee works.

C. DAMAGES ON COMPLAINT AND ON COUNTERCLAIM FOR FMLA OVERPAYMENTS

With respect to damages owed to plaintiffs, Section 1132(g)(2) provides:

> In any action under this subtitle by a fiduciary for or on behalf of a plan to enforce section 1145 in which a judgment in favor of the plan is awarded, the court shall award the plan-
>
> (A) the unpaid contributions,
>
> (B) interest on the unpaid contributions,
>
> (C) an amount equal to the greater of-
>
> > (i) interest on the unpaid contributions, or
> >
> > (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>
> (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).   (See also Dkt. #34, at 20-21).

Under Section 1132(g)(2), defendants' "failure to pay contributions before plaintiffs filed this lawsuit entitles plaintiffs to recover interest, liquidated damages, attorney's fees and costs." Trustees of the Bldg. Serv. 32B-J Health Fund v. Triangle Servs., Inc., No. 05 Civ. 2546 (NRB), 2006 WL 3408572 , at *2 (S.D.N.Y. Nov. 22, 2006).  As the Second Circuit has held, "[p]ermitting delinquent employers to avoid paying § 1132 penalties after suit is filed . . . would largely thwart the purpose of § 1132(g)(2) to provide plan fiduciaries with an effective weapon against delinquent employers." Iron Workers Dist. Council of Western N.Y. & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc., 68 F.3d

1502, 1508 (2d Cir. 1995)(citation omitted).   "[T]he amount of an award of interest or liquidated damages should logically be predicated upon the amount of the unpaid contributions originally at issue, whether or not outstanding at the time of judgment, since that amount correctly measures the damage caused by the delinquency." See Iron Workers, 68 F.3d at 1507.

As of May 18, 2009, the Welfare Fund's total delinquency is $119,305.65, plus $7,179.21 in interest, and the Pension Fund's total delinquency is $41,657.81, plus $2498.42 in interest. (Exh. 35).[34]  Liquidated damages will be assessed at 20% of the total delinquency as such number is greater than double the interest.  29 U.S.C. § 1132(g)(2)(C)(ii).  **On or before November 13, 2009**, plaintiff Funds shall file an current damages analysis, along with documentation in support of attorney's fees and costs; defendants may file their response **on or before December 4, 2009**; and plaintiffs may file their reply, if any, **on or before December 14, 2009**.

With respect to the damages due to defendants for the FMLA Overpayments in the First Count of their counterclaims, the Court will provide both counsel with an opportunity to address, between themselves, the exact amount of the refund and the best mechanism for offset, consistent with Section V of the Contribution/Collection Policies and Procedures. If counsel are unable to resolve these two last issues amicably, then they may submit supplemental briefs on **November 20, 2009**, with briefs in opposition on **December 11, 2009**, and reply briefs, if any, **on or before December 18, 2009**.

---

[34]Pane testified that the plaintiff Funds are not seeking any audit costs regarding their claim against defendants.  (Tr. 162)

<u>III. CONCLUSION</u>

For the reasons stated above, <u>judgment shall enter in favor of plaintiffs on their complaint, with the amount of damages to be assessed in the near future, judgment shall enter for defendants regarding the FMLA Overpayments in the First Count of their counterclaims, with the amount of damages and the mechanism for damages to be resolved in the near future (by the parties or the Court), and judgment shall enter for plaintiffs regarding the remainder of defendants' counterclaims</u>.

SO ORDERED.

Dated at New Haven, Connecticut, this 26th day of October, 2009.


<u>/s/Joan Glazer Margolis, USMJ</u>
Joan Glazer Margolis
United States Magistrate Judge